UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COVERALL NORTH AMERICA, INC., | 05 - 11874 MLW

Petitioner,

vs.

Civil Action No.

ADELSON SODRE,

Respondent.

RECEIPT # 66898
AMOUNT $ 250
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK
DATE 9/15/05

PETITION TO COMPEL ARBITRATION

Petitioner, Coverall North America, Inc. ("Coverall"), by its attorneys, as and for its

Petition to Compel Arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 1,

*et seq.*, states as follows:

MAGISTRATE JUDGE Alexander

### Nature Of The Action

1.    This is an action brought pursuant to § 4 of the Federal Arbitration Act, 9 U.S.C.

§ 4, to compel arbitration. Pursuant to the written Franchise Agreement entered into by and

between Petitioner Coverall and Respondent, the parties agreed to submit all disputes arising out

of or relating to the Franchise Agreement, its validity or the relationship of the parties, to

arbitration to be conducted in Massachusetts before the American Arbitration Association.

2.    After certain disputes arose between the parties, and after the parties' efforts to

mediate those disputes proved unsuccessful, Coverall commenced arbitration proceedings

against the Respondent.    Shortly after those arbitration proceedings were commenced,

Respondent's counsel advised the American Arbitration Association that Respondent disputed

"that there is a valid arbitration agreement between [Respondent] and Coverall."

3.    By this action, Coverall seeks to compel Respondent to arbitrate the dispute set forth in Coverall's Demand for Arbitration, as well any counterclaims Respondent intends to assert against Coverall, as provided for in the parties' written arbitration agreement.

## The Parties

4.    Petitioner Coverall is a Delaware corporation with its principal place of business in Boca Raton, Florida. Coverall is engaged in the business of granting franchises to qualified persons to operate commercial janitorial cleaning businesses, and to use Coverall's trade names and marks, as well as Coverall's operating system (the "Coverall® System"), in connection therewith. Coverall franchisees are provided with, among other things, training, equipment, billing and collection services, and a quality control program. Coverall also provides its franchisees customer accounts to clean. Under the Coverall System, Coverall enters into contracts with customers for cleaning services, and delegates the performance of the services under the contracts to its franchisees.

5.    Respondent Adelson Sodre is a franchisee of Coverall. On information and belief, the Respondent is a resident and citizen of the Commonwealth of Massachusetts.

## Jurisdiction and Venue

6.    This action arises under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*

7.    This Court has original subject matter jurisdiction of this action in that, save for the parties' agreement to arbitrate, this Court would have jurisdiction under 28 U.S.C. § 1332 of a civil action arising out of the controversy between the parties, in that the parties are citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

- 2 -

~BOST1:391127.v1

8.    Venue is proper in this Court under 9 U.S.C. § 4, in that this is the United States District Court having jurisdiction over the contractually specified site of arbitration, and 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

**The Franchise Agreements And The Parties' Arbitration Agreements**

9.    On or about August 27, 2002, Cesar Santos entered into a written Janitorial Franchise Agreement with Coverall d/b/a Coverall of Boston pursuant to which Coverall granted Santos a franchise to operate a commercial janitorial business in the Boston, Massachusetts area. On or about December 29, 2003, Adelson Sodre entered into an agreement to purchase the franchise of Cesar Santos and to assume the obligations under the written Janitorial Franchise Agreement with Coverall d/b/a Coverall of Boston.

10.    Under Section 21 of the Franchise Agreement, the parties explicitly agreed that they would submit all disputes arising out of or relating to the Agreement, the validity of the Agreement or the parties' relationship to arbitration before the American Arbitration Association. Section 21 of the Franchise Agreement provides, in pertinent part, that:

[A]ll controversies, disputes, or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arising our of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Coverall Policy and Procedure Manual . . . shall be submitted promptly for arbitration.

Arbitration shall be subject to the Federal Arbitration Act and, except as otherwise provided in this Agreement or agreed upon by the parties, the then current Rules of the American Arbitration Association for Commercial Arbitration.

- 3 -

~BOST1:391127.v1

The arbitration shall take place in the Area in which the Franchisee conducts its business, and shall be administered by the office of the American Arbitration Association or as mutually agreed by the parties.

\* \* \*

Franchisee and Coverall agree that arbitration shall be conducted on an individual, not class wide basis.

11. Section 21.C of the Franchise Agreement provides that "Should either Party incur attorney's fees in order to enforce the terms and conductions of this Agreement, including post-term covenants, whether or not an arbitration proceeding is instituted, the prevailing party shall be entitled to reimbursement by the other party of all litigation costs, including attorneys' fees."

12. The parties' written arbitration agreement is valid, has not been revoked and is enforceable upon such grounds as exist at law or in equity.

13. The parties' written arbitration agreement appears in a contract evidencing a transaction involving interstate commerce.

14. The making of the arbitration agreement is not at issue. Nor is any failure to comply therewith.

15. Coverall is not in default in proceeding with such arbitration by failing, neglecting, or refusing to arbitrate under the parties' written agreement to arbitrate.

## Respondents' Refusal To Arbitrate Their Disputes

16. In or around early 2005, certain disputes arose between the parties. The disputes were subsequently submitted to non-binding mediation in accordance with the provisions of the parties' Franchise Agreement. The parties were not able to resolve their disputes.

17. On August 30, 2005, Coverall filed an arbitration proceeding against Respondent seeking to resolve its various claims. The arbitration is captioned as *Coverall North America,*

- 4 -

~BOST1:391127.v1

*Inc. v. Adelson Sodre*, Case No. 11-114-E-01904-05. Coverall's Demand for Arbitration seeks, among other things, damages for Respondent's breach of the Franchise Agreement, declaratory relief and attorneys' fees. (A true and correct copy of the Demand for Arbitration is attached as Exhibit A.)

18.    In a September 14, 2005 letter to the American Arbitration Association, Respondent's counsel stated that Respondent "dispute[s] that there is a valid arbitration agreement between [him] and Coverall." The presumed basis for this belief is Respondent's contention that Respondent "should have been classified as [an] employee[] of Coverall, rather than independent contractor[]" – an assertion that Respondent's counsel asserted would be part of a class action lawsuit to be filed against Coverall. (A copy of this letter is attached hereto as Exhibit B.)

19.    Respondent's claim that he should have been classified as an employee of Coverall rather than as an independent contractor arises out of or relates to "the relationship of the parties" and the Franchise Agreement, and therefore fall within the scope of the parties' written arbitration agreement.

## Specific Relief To Compel Arbitration

20.    Respondent's assertion that he is not bound to arbitrate his dispute with Coverall constitutes a failure, neglect and/or refusal on his part to arbitrate in accordance with the parties' written arbitration agreement.

21.    Petitioner has no adequate remedy at law.

22.    No previous Petition has been made for the relief requested herein.

- 5 -

~BOST1:391127.v1

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioner Coverall North America, Inc. respectfully prays for the following relief against Respondent:

A.     An order pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, made in the manner provided by law for the making and hearing of motions, compelling arbitration in accordance with the terms of the parties' arbitration agreement;

B.     An award of reasonable attorneys' fees, expenses and costs incurred by Coverall in this action; and

C.     Such other relief as the Court deems just and proper.

COVERALL NORTH AMERICA, INC.,

By its attorneys,

Michael D. Vhay (BBO #566444)
Traci S. Feit (BBO# 660688)
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA  02110-2600
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Dated:  September 15, 2005

- 6 -

~BOST1:391127.v1

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## BOSTON, MASSACHUSETTS

**COVERALL NORTH AMERICA, INC.,**

Claimant,

v.

**ADELSON SODRE,**

Respondent.

## DEMAND FOR ARBITRATION

Claimant, Coverall North America, Inc. ("Coverall"), by its attorneys, as and for its

Demand for Arbitration against Respondent, Adelson Sodre, states as follows:

### Nature of the Action

1.    By this action, Coverall seeks to recover the balance due on a note payable to

Coverall, and a declaration that Sodre is not an "employee" of Coverall. Coverall also seeks the

costs and fees incurred in connection with this action, as provided for in the parties' arbitration

agreement.

### Parties

2.    Coverall is a Delaware corporation with its principal place of business in Boca

Raton, Florida. Coverall is a sales and marketing company engaged in the business of selling

franchises to operate commercial janitorial cleaning businesses. Coverall franchisees have the

right to use Coverall's trade names, marks, and operating system (the "Coverall® System") in

connection with their franchises. Coverall trains its franchisees in all aspects of owning their

own business, including how to manage cash flow, how to hire and fire employees, and how to

grow their business. Coverall also provides its franchisees with training in state of the art

cleaning methodologies. To provide franchisees with a firm footing in their new businesses and

generate immediate cash flow, Coverall provides its franchisees with an initial customer base.

Thereafter, franchisees may procure customers on their own or purchase additional business

from Coverall.

     3.     Respondent Sodre is a resident of Massachusetts. He is a franchisee of Coverall.

## The Parties' Written Franchise Agreement

     4.     On or about August 27, 2002, Cesar Santos entered into a written Janitorial

Franchise Agreement (the "Franchise Agreement") with Coverall d/b/a Coverall of Boston

pursuant to which Coverall granted Santos a franchise (the "Santos Franchise") to operate a

commercial janitorial business in the Boston, Massachusetts area. (A true and correct copy of

the Franchise Agreement is attached hereto as Exhibit A.)

     5.     On or about December 29, 2003, Respondent Sodre agreed to purchase the Santos

Franchise from Mr. Santos. On or about that same date, Sodre executed a written agreement

with Coverall and Mr. Santos under which Coverall consented to the transfer of the Santos

Franchise to Sodre, and Sodre assumed a note payable to Coverall (the "Note") in the amount of

$2,384.21. (A true and correct copy of the Consent to Transfer Agreement is attached hereto as

Exhibit B.) Sodre also signed a personal guaranty of the Note. (A true and correct copy of the

Guaranty is attached hereto as Exhibit C.)

     6.     Sodre has made no payments under the Note since June 2004.

     7.     Sodre has a balance due under the Note in the amount of $1,618.89.

     8.     Furthermore, despite his contractual acknowledgment that he is an independent

contractors and not an employee, and despite the nature of the parties' relationship, Sodre has

asserted that he is an employee of Coverall and, as a result, is entitled to, among other things

(i) hourly wages; (ii) the statutory minimum wage; (iii) a time-and-a half rate of pay for any

2

~BOST1:387135.v5

hours worked in excess of 40 hours/week, (iv) payment for travel time, (v) workers' compensation insurance, and (vi) unemployment benefits. Coverall contends that Sodre is a franchisee, and not an employee, and seeks a declaration to that effect.

9.    Accordingly, there is an actual controversy between the parties in this case and a declaration of the rights of the parties would terminate the controversy or some part thereof.

## The Relief Sought

10.    Coverall seeks an award of the balance due on the Note. Coverall also seeks a declaration that it owes no duties to Sodre as an employer under Massachusetts law.

**WHEREFORE,** Coverall respectfully requests that the Arbitrator issue an award:

A.    Awarding Coverall the balance due on the Note;

B.    Declaring that Sodre is a franchisee, and not an employee, of Coverall;

C.    Awarding Coverall the costs and fees incurred in this arbitration, as provided for in the parties' Franchise Agreement; and

D.    Such other and further relief as the Arbitrator deems just and proper.

**COVERALL NORTH AMERICA, INC.,**

By:    _____
One of its Attorneys

Michael D. Vhay (BBO# 566444)
**DLA Piper Rudnick Gray Cary US LLP**
One International Place, 21st Floor
Boston, MA 02110
(617) 406-6000

Norman M. Leon
**DLA Piper Rudnick Gray Cary US LLP**
203 North LaSalle Street, Suite 1900
Chicago, IL 60601
(312) 368-2192

Dated: August 30, 2005

3

~BOST1:387135.v5

FRANCHISE # F694

NOTE: This is for new agreements
(not for transfers or renewals).

## COVERALL NORTH AMERICA, INC.
### d/b/a Coverall of Boston
### 105 Central Street, Suite 110
### Stoneham, Massachusetts 02180
## JANITORIAL FRANCHISE AGREEMENT

THIS AGREEMENT (hereinafter referred to as "Agreement") is entered into by and be~~~~~~~~~c., dba
Coverall of Boston, a corporation organized and existing under the laws of the Stat~~~~~~~~~d to as
"Coverall," and _____Ce Son    Santos_____~~~~~~~~~arly or
collectively) as "Franchisee" for the purposes of allowing Franchisee to operate a business as a Franchisee of Coverall Franchisee
is doing business as a:

☑ Sole Proprietorship  ☐ Partnership  ☐ Corporation, incorporated under the laws of _____

Effective Date of Agreement: **The effective date of this Agreement will be the date it is signed by the Regional Director and Franchisee; provided, however, that if the Agreement is not signed by a corporate officer as provided on the last page of this Agreement, then the Agreement will not be effective.**

Term of Franchise ("Initial Term"): 20 years
**Franchise Package**
Package Purchased: **P- _6 o o_**

Monthly $ Volume of Initial Business: $ _6 o o_

Initial Business Offering Period: _12 o_ days
(in which Initial Business shall be offered after Franchisee's completion of initial training - calculated per Paragraph 4A hereof)

Initial Franchise Fee: $ ____6, o o o____

Down Payment: $ ____1 5 o o____

Amount Financed by Coverall: $ ____4 5 o o____
(with interest at 12% per annum)
24
Financing Period: ~~24-83~~ months
(equal consecutive monthly installments of principal & interest)

Amount of Each Monthly Installment: $ _2 11. 83_

The first installment of principal and interest shall be paid on the last day of _____Dec_____, _o o_.

**REPRESENTATIONS**    Franchisee makes the following representations:  If Franchisee is a sole proprietor, partnership, or corporation, there is set forth below, as the case may be, the name, address and other information of the sole proprietor, of each partner of the partnership, or of each shareholder in the corporation:

| Name | Address | Phone | Social Security # | Percentage Interest* |
|------|---------|-------|-------------------|---------------------|
| Ceson Santos | 80 Prince St | 617-923-6293 | 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 | 100% |
|  | Apt 2 |  |  |  |
|  | Watch Town, Mas 02472 |  |  |  |

*As to a partnership, this shall indicate the percent owned in the capital and/or profits of the partnership. As to a corporation, this shall indicate the percent owned of the outstanding stock of the corporation.

Federal I.D. # of Franchisee if a partnership or corporation: _____

Address for mailing notices to Franchisee: _____

Franchisee acknowledges receipt from Coverall of a Franchise Disclosure Document which describes the Franchise to be operated pursuant to the terms of this Agreement. Franchisee acknowledges receipt of a completed copy of this Agreement at least five (5) business days prior to its execution.

_____
**Franchisee's Signature**

_____
**Franchisee's Signature**

Exhibit A.1 to



approved by Coverall. Franchisee agrees not to use the Marks or any name or design confusingly similar to the Marks in Franchisee's corporate or other legal or business name. Franchisee must promptly tell Coverall if Franchisee learns about unauthorized use of Coverall's confidential, proprietary, and copyrighted information. Coverall will respond to this information as it deems appropriate.

        B.     <u>Termination of License.</u> Upon the expiration or termination of this Agreement and the license herein granted, for any reason whatsoever, Franchisee agrees that it will, in addition to complying with Paragraphs 12, 18 and 19B and other applicable provisions hereof, immediately discontinue the use of the Marks, deliver and surrender to Coverall each and every Mark and every label, promotional item, manual, form, and any physical object bearing or containing any of said Marks and any other items that may be set forth herein; and Franchisee shall not use any of Coverall's confidential information, trade secrets, processes, methods of operation or goodwill, all of which are and shall remain vested solely in Coverall and used only co-extensively with the terms of this Agreement; and Franchisee shall not, directly or indirectly, thereafter operate or do business under any name or in any manner, whether as an individual, agent, partner, shareholder, officer or director, that might tend to give the public the impression that Franchisee is operating a business operated, owned, licensed by, or affiliated with Coverall; and Franchisee shall cease to service in any fashion the customer accounts which it serviced while it was a Franchisee.

        C.     <u>Coverall the Sole Owner.</u> Franchisee agrees that, as between Coverall and Franchisee, the Marks are the sole and exclusive property of Coverall; and Franchisee now asserts no claim and will hereafter assert no claim to any goodwill, reputation, or ownership thereof by virtue of Franchisee's licensed use hereof. Franchisee agrees that it will not do or permit to be done any act or thing in derogation of any of Coverall's rights in connection with the same, either during the Initial Term of this Agreement or thereafter, and that Franchisee will use same only for the uses and in the manner as permitted in this Agreement. Franchisee further agrees that Coverall may, in its sole discretion, revoke the license to use the name "Coverall" and/or design and direct the use of a modified, different, or substitute name and/or design, and that, in such an event, Franchisee will, at its sole expense, cease use of the name and/or design so revoked and promptly commence to use, implement and display in the operation of its business any such modified or substitute name and/or design.

        2.     <u>TERM AND RENEWAL.</u> This Agreement shall remain in full force and effect for a period of twenty (20) years from the date of execution (the "Initial Term") unless sooner terminated as hereunder provided. Upon the expiration of the Initial Term of this Agreement, Franchisee shall have no further rights in the Franchise or the Agreement or the right to perform services under the contracts with the customer accounts unless Coverall and Franchisee execute a written renewal agreement ("Renewal Agreement"), as provided below. The franchise shall be renewed if Franchisee:

        A.     Gives Coverall written notice of Franchisee's intent to renew not more than one hundred eighty (180) days nor less than ninety (90) days prior to the date of expiration of the Initial Term.

        B.     Executes, at least thirty (30) days prior to the date of expiration of this Agreement, the then current Coverall Janitorial Franchise Agreement ("Renewal Agreement"), and any other documents which Coverall deems necessary for Franchisee to execute upon renewal ("the Related Documents"). The Renewal Agreement and the Related Documents, shall be on the same terms and conditions, including the renewal term (the "Renewal Term") as Coverall is then granting to new franchisees, excepting that there shall be no payment of any additional franchise fee or renewal fee for such Renewal Term; further excepting that the Renewal Agreement will not obligate Coverall to provide any volume of Initial Business.

        C.     Is not in default of, and has been in substantial compliance with, this Agreement or any other agreement between Franchisee and Coverall on the date of giving notice, the date of execution of the Renewal Agreement, and the date of expiration of the Initial Term.

        D.     Executes a general release, in a form satisfactory to Coverall, releasing Coverall from any and all claims, known or unknown, arising from this Agreement.

        E.     Has not received from Coverall, at least six (6) months prior to the date of expiration of the

(1)    · for up to a maximum of twelve (12) months from the starting date of Franchisee's services if, for each month of service, Franchisee (i) performs monthly inspections with the customer or replacement customer, and (ii) submits to Coverall by the fifth day following each inspection a completed Inspection Report (also known as a Survey Report) signed by the customer. If for any month during this twelve (12) month period Franchisee fails to perform a monthly inspection for any account(s) and timely submit a completed Inspection Report for that account(s), as above provided, then and in such event the last six months of this twelve (12) month Initial Business Guarantee (or such portion of the remaining six months of any account(s) for which Franchisee has failed to perform monthly inspections and timely submit completed Inspection Reports) will, for such account(s), be forfeited, and the Initial Business Guarantee will remain for said account(s) only for the balance of the first six month period, if any; or

(2)    · for six months from the starting date of Franchisee's services, if monthly inspections are not performed and completed Inspection Reports are not submitted; and

(3)    all replacement customers are guaranteed for the remainder of the initial guarantee period.

C.    The time within which Coverall must offer the Initial Business shall be extended upon the parties' mutual agreement or for the following periods of time in the following circumstances:

(1)    Retraining of Franchisee.    If retraining of Franchisee is required pursuant to Paragraph 6A(2) hereof, the time for offering Initial Business shall be suspended as provided in Paragraph 6A(2).

(2)    Franchisee's Material Breach of the Agreement.    If Franchisee is in breach of any material provision of this Agreement or any other agreement between Franchisee and Coverall, the time within which to offer the Initial Business will be suspended until all material breaches are cured. Coverall's right to suspend the offering of Initial Business as is set forth in this Paragraph will not waive Coverall's rights under this Agreement to terminate Franchisee's franchise for such material breach.

D.    In the event Coverall fails to timely offer Initial Business in accordance with the provisions of this Paragraph 4, Franchisee's sole remedy shall be as set forth in Paragraph 8C of this Agreement.

5. ·    ADDITIONAL DOLLAR VOLUME.

A.    · Additional Dollar Volume Offered by Coverall. During the Term of this Agreement, Coverall may from time to time and at any time provide Franchisee an increase in either the number of customer accounts and/or the dollar volume of customer accounts which Franchisee services and/or an increase in existing business through an increased percentage of occupancy or scope of services required (separately and collectively known as "additional accounts," "additional customer accounts," "additional dollar volume," or "Additional Business"). If Franchisee accepts such additional dollar volume on its behalf, Franchisee shall pay Coverall a sales and marketing fee pursuant to Paragraph 7B of this Agreement. Such additional dollar volume shall be subject to the terms and provisions of this Agreement except for the provisions of Paragraph 4.

B.    Guarantee.    Subject to the terms and conditions set forth in this Paragraph, the additional dollar volume which is provided by Coverall (as described in Paragraph 5A above) shall be guaranteed for up to six months under the following circumstances: The additional dollar volume will be replaced with equal monthly dollar volume if the customer fails to pay for services rendered or if the services of the Franchisee are terminated for any reason except faulty workmanship, lack of trustworthiness, or other claimed defaults on the part of Franchisee. Coverall will replace this additional dollar volume within a reasonable time. This guarantee for additional dollar volume is provided under the following conditions: (i) for up to six months from the starting date of Franchisee's services if, for each month of service, Franchisee performs monthly inspections with the customer or replacement customer and submits to Coverall by the fifth day following each inspection a completed Inspection Report signed by the customer; and (ii) all replacement customers shall be guaranteed for the remainder of the six month guarantee period.

(as regards Additional Business) any remaining Initial Business and/or Additional Dollar Volume, as the case may be, will be suspended from the time Franchisee is requested to attend retraining until Franchisee completes such retraining to Coverall's satisfaction. Retraining shall be deemed Additional Training, as that term is hereinabove defined. Accordingly, Franchisee will be charged an Additional Training fee for such retraining, in accordance with the provisions of Paragraph 7F hereof.

B.    Promotional and Sales Materials. Coverall shall make available to Franchisee, at Franchisee's expense, promotional or sales materials for use in developing Franchisee's business.

C.    Billing, Collection, and Records. Coverall has the exclusive right to perform all billing and accounting functions for services and supplies provided by Franchisee. At the beginning of each month, Coverall shall invoice and collect payment from the customer accounts for all services and supplies provided by Franchisee. On the last day of the first month (if the last day of the month falls on a weekend and/or holiday, payment will be made on the next business day) following the month in which the services and supplies are provided by Franchisee, Coverall will, subject to the provisions of Paragraph 6D, pay to the Franchisee amounts due Franchisee which were collected from customer accounts, excluding amounts retained by Coverall on Strategic Accounts, less amounts due Coverall for the fees described in Paragraphs 7 and 14, as well as note payments, transfer fees, equipment lease payments, advances, and any other amounts due Coverall or any third party lender through whom Franchisee has financed any purchase from Coverall. All customer payments made to Coverall and all credits due Franchisee shall be applied, in whole or in part, to Franchisee's then due or past due obligations under this Agreement and all other agreements, present and future, between Coverall and Franchisee.

If the services performed by Franchisee on any Coverall customer account(s) are discontinued for any reason, unless the customer account(s) is guaranteed as provided in Paragraphs 4 and 5 above, Coverall shall have the right to apply the entire amount of any payment subsequently received by Coverall from the customer account(s) no longer serviced by Franchisee to the balance (principle and/or interest) of any amount owed by Franchisee to Coverall, including but not limited to, promissory note(s), line of credit or any other financing provided to Franchisee by Coverall. Coverall shall also have the right but not the obligation, to pay any amount remaining after applying the payment to Franchisee's obligations to Coverall, to any third party lender from whom Franchisee borrowed funds to finance any purchase from Coverall. Nothing contained in this Paragraph 6C, however, shall be construed to release the Franchisee from its obligations to Coverall for any amount remaining due after applying the funds received from the discontinued customer account(s).

Coverall shall be entitled to recover from Franchisee all reasonable attorneys' fees, court costs, and expenses, and out-of-pocket costs which may be incurred by Coverall in enforcing payment by any customer accounts and/or payment by Franchisee and Franchisee's lenders, guarantors, or others. Coverall may, in its sole discretion, assign to Franchisee the right to enforce payment on any delinquent customer account(s) which Franchisee is servicing. This shall include the right of Franchisee to file a lawsuit against the delinquent customer. In the event of such an assignment, Franchisee shall pay any and all attorneys' fees, court costs and expenses necessary to collect and enforce payment. If, as a result of the assignment, Franchisee collects monies due on a delinquent customer account, Franchisee shall be responsible to Coverall for any unpaid royalties, management fees, note payments, and other payments (if any) due Coverall on amounts collected. Franchisee will keep Coverall timely advised as to any legal or other proceedings which Franchisee institutes, including, but not limited to, the outcome. Coverall shall also be entitled to grant a security interest in the receivables due from the customer accounts.

D.    Cash Flow Protection Services. Coverall will advance to the Franchisee the amounts billed to customers serviced by Franchisee, whether or not those amounts have been collected, less amounts due Coverall. Advances will be made no earlier than the last day of the first month (if the last day of the month falls on a weekend and/or holiday, payment will be made on the next business day) following the month the services and supplies were provided. Advances attributable to billings for any one customer shall not exceed an amount equal to billings for sixty (60) days and shall not remain outstanding for a period exceeding ninety (90) days from the date on which the amount of the billing was due from the customer. If advances remain uncollected from the customer at the end of ninety (90) days, Franchisee shall repay Coverall the amount of the advance.

The sales and marketing fee shall be calculated as set forth in the Coverall Policy and Procedure Manual, as it may from time to time be modified or revised by Coverall.

C.    Royalty.  A royalty in an amount equal to five percent (5%) of the amount billed customers for any and all services and supplies provided by Franchisee, shall be payable monthly on the last day following the last day of the month in which the services were performed. The sum total of the royalty and management fees may, at the discretion of Coverall, be subject to minimum payments of $50 per month in the first year of operation and $100 per month thereafter. The minimum fee may be adjusted for increases in the Consumer Price Index.

D.    Management Fee.  A management fee, as described in Paragraph 6E, hereof, in an amount equal to ten percent (10%) of the amount billed customers for any and all services and supplies provided by Franchisee, shall be payable monthly on the last day following the last day for the month in which the services were performed.

E.    Special Services Finder's Fee.  A fee shall be charged for special service contracts, for example, a one-time, non-recurring contract for services such as carpet cleaning, strip and waxing, or initial cleaning. The amount of the fee shall be twenty percent (20%) of the total special services contract price, unless Franchisee sells the job to the customer and furnishes all equipment, supplies and labor, in which case no fee will be charged. The total special services contract price equals the gross revenue from the contract to Franchisee before deduction of any other fee(s) payable to Coverall. Amounts billed customers for special services are subject to royalty and management fees.

F.    Additional Training Fee.  A fee shall be charged for Additional Training, as that term is defined in Paragraphs 6A (2) and (3) hereof. The Additional Training fee for each Additional Training course attended by Franchisee, and/or by Franchisee's employees, shall be Fifty ($50.00) Dollars. Coverall reserves the right to change the fee for any Additional Training course by setting forth the fee, as so changed, in the Coverall Policy and Procedure Manual as it may, from time to time, be amended. The Additional Training fee shall be due at the time of the Additional Training; however, Coverall may, in its sole discretion, upon the request of Franchisee, finance this Additional Training fee so that it is payable in up to twelve (12) equal monthly installments of principal and interest (which interest shall be at the rate of twelve (12%) percent per annum). If Coverall agrees to finance this Additional Training fee, Franchisee shall, prior to the Additional Training, sign a promissory note payable to Coverall, in the amount of the Additional Training fee. Notwithstanding the above, Additional Training fees totaling less than One Hundred Fifty ($150.00) Dollars in the aggregate will not be financed, and will be due at the time of the Additional Training.

G.    Alternative Financing.  Coverall reserves the right to extend, or make available to Franchisee alternative forms of financing, including the following:

1.)    Line of Credit.  For purposes of this Agreement, the term "line of credit" shall mean a monetary amount which Coverall shall make available to Franchisee, and upon which Franchisee may draw, on a continuing basis, up to the maximum limit of the line of credit, for payment of a portion of Franchisee's Initial Franchise Fee, the purchase of Additional Dollar Volume (as defined in Paragraph 5A) and/or toward payment of any other item for which Coverall agrees to provide Franchisee financing under the terms of this Agreement. The initial limit of the line of credit shall be determined by Coverall, and Coverall may thereafter, in its sole discretion, increase or decrease the amount of the line of credit. At such time as the line of credit is extended to Franchisee, Franchisee will be required to execute such documents regarding the line of credit as are required by Coverall. Franchisee's obligations under the line of credit shall be as follows:

(a)  When there is no promissory note(s) payable by Franchisee at the time the line of credit is extended:

(i.)    The initial amount financed under the line of credit shall be repaid by the Franchisee in monthly installments of principal and interest over a 24 to 48 month period, as agreed on by Franchisee and Coverall. Repayment of the amount financed through the line of credit shall commence with the first Franchisee statement reflecting billings to accounts serviced

under Paragraph 4A(ii) hereof; or (iii) not replaced by Coverall under Paragraph 4B hereof, as the case may be, shall (a) be multiplied by two and eight-tenths (2.8) - the resultant figure shall be referred to as "the Gross Recalculated Amount;" (b) The current replacement cost of Franchisee's starter kit shall be subtracted from the Gross Recalculated Amount - the resultant figure shall be the "Amount Payable to Franchisee."

(2) . Payment of Amount Payable to Franchisee. If, at the time of the determination of this amount, Franchisee is indebted to Coverall, Franchisee's indebtedness shall be canceled up to the whole thereof, before the balance (if any) is paid to the Franchisee in cash or kind.

B. Additional Business. If Coverall is unable to provide or replace all or any portion of Franchisee's additional Business in accordance with the provisions hereof within a reasonable period of time, Franchisee's sole remedy shall be a refund of whatever sales and marketing fee was actually paid by Franchisee for the dollar volume of Additional Business not so provided or replaced by Coverall. If, at the time of this refund, the Franchisee is indebted to Coverall, this refund shall be accomplished by the cancellation, up to the whole thereof, of such indebtedness, before the balance (if any) is paid to the Franchisee in cash or in kind.

C. Sole Remedy. Franchisee acknowledges and agrees that the payment by Coverall to Franchisee of the Amount Payable to Franchisee, as provided in Paragraph 8A hereof, shall be Franchisee's sole remedy in the event of Coverall's (i) failure to timely offer Initial Business; or (ii) failure to offer Franchisee, within a reasonable time after the expiration of the Initial Offering Period, a volume of Initial Business equal to that initially rejected by Franchisee upon timely offer (as provided in Paragraph 4A(ii) hereof); or (iii) failure to replace Initial Business as provided in Paragraph 4B hereof. Franchisee further acknowledges and agrees that the refund to Franchisee, as provided in Paragraph 8B hereof, shall be Franchisee's sole remedy in the event Coverall is unable to provide or replace any portion of Franchisee's Additional Business. Franchisee agrees that this payment or refund is necessary as it would otherwise be difficult, if not impossible, to ascertain the damages incurred by Franchisee in the event of any failure by Coverall to timely offer or replace Initial Business, or to timely provide or replace Additional Business. The parties agree that such payment or refund is not a penalty to Coverall, but is a payment which Coverall must provide as liquidated damages as a consequence of Coverall's failure to offer or replace Initial Business, or to provide or replace Additional Business. Upon Coverall's paying Franchisee, as provided in Paragraph 8A or 8B above as the case may be, Coverall shall be released from any obligation to offer or replace such Initial Business, or to provide or replace such Additional Business, or to pay Franchisee any other damages.

## 9.     FRANCHISEE BUSINESS OPERATIONS.

A. Franchisee To Attend Training Course. Franchisee shall attend the initial training as defined and described in Paragraph 6A(1) hereof, which is provided by Coverall to all new franchisees, and any other training courses Coverall may prescribe with respect to the needs of Franchisee or a particular customer serviced by Franchisee. The person signing this Agreement on behalf of Franchisee shall attend the initial training unless Coverall, in its sole discretion, agrees in writing to allow a designee of Franchisee to attend the initial training in lieu of the person signing this Agreement. Seminars shall be attended as provided in Paragraph 6A(1) hereof, although Franchisee's employees may also attend such training. While there shall be no additional charge for the taking of Initial Training courses, Franchisee shall be charged a fee for retaking Initial Training courses, including any retraining required under Paragraph 6A (3) hereof. The fee for the retaking of Initial Training courses and the manner of payment shall be as provided in Paragraph 7F hereof.

B. Franchisee to Abide by Policies and Procedures. Franchisee understands and acknowledges that every detail of the System is essential to Franchisee, Coverall, and other System franchisees in order to (i) develop and maintain quality operating standards, (ii) increase the demand for the services sold by all franchisees operating under the System, and (iii) protect Coverall's reputation and goodwill. Franchisee agrees to operate its business and provide service to customers in a manner consistent with the procedures, methods, and standards established in such training programs and all manuals and directives, which shall include, but shall not be limited to, the Coverall Janitorial Franchise Policy and Procedure Manual ("the Policy and Procedure Manual"), as it may be amended from time to time, and/or other policies or procedures which Coverall thereafter may issue from time to time. Franchisee shall refrain from operating in any manner which reflects adversely on Coverall's Marks or System. Franchisee may

Initial     Initial

Coverall Marks. Franchisee thus acknowledges that the requirements of this Paragraph are necessary to assure continuing public acceptance and patronage of the Coverall System.

A.    <u>Franchisee to Furnish Staff, Equipment, Materials, and Supplies.</u> In consideration of the franchise fee paid by Franchisee, Coverall will provide, upon the opening of Franchisee's business, the equipment and supplies listed in Exhibit A of this Agreement. Thereafter, Franchisee will replace such equipment and supplies as needed and will provide all staff, other equipment, materials, tools, and other supplies necessary to service customer accounts, including all janitorial services called for in each such customer contract. In order to protect Coverall's Marks, all such services will be performed in a good and workmanlike manner, satisfactorily to the customer account for which such services are performed and in accordance with Coverall performance standards. Coverall may, at any time, inspect any premises serviced by Franchisee to assure that the quality of the services rendered is in accordance with Coverall standards. If Franchisee desires to cease servicing a customer account, Franchisee must give Coverall ten (10) days' written notice before ceasing such service; in such event any remaining guarantee on said account shall be deemed to have been fulfilled, and Coverall shall have no obligation to replace said account.

B.    <u>Protection of the Goodwill of the System.</u> Coverall, the Coverall System and Marks, and Coverall's Franchisees benefit from Coverall's goodwill, which arises out of Coverall's reputation in the market place. In order to protect Coverall and its Franchisees from the harm that arises from Franchisee activities that diminish Coverall's goodwill and Marks, Franchisee agrees that Coverall has the right to discontinue Franchisee's services to any customer upon the occurrence of any of the following:

    (1)    Franchisee fails to perform its obligations to the customer's satisfaction; or,

    (2)    The customer has made an oral or written complaint to Coverall; or,

    (3)    Coverall or the customer has given Franchisee written notice of Franchisee's failure to perform and five (5) days after delivery of the notice either the customer or Coverall is not satisfied that Franchisee has performed; or

    (4)    Franchisee receives three (3) written notices of failure to perform within a period of sixty (60) consecutive days, regardless of whether the Franchisee cured the deficiencies; or

    (5)    Coverall receives a request from a customer to terminate its contract; or,

    (6)    Coverall receives a request from a customer to replace the Franchisee; or

    (7)    Franchisee services any customer other than as a Franchisee of Coverall; or

    (8)    Franchisee fails to service a customer on any two (2) occasions within a period of sixty (60) days; or

    (9)    Franchisee ceases or refuses to service, or discontinues servicing, a customer for any reason without Coverall's consent; or

    (10)    Franchisee engages in conduct that reflects materially and adversely upon the operation and reputation of Coverall's and/or Franchisee's business(es) or the Marks or the System.

Upon the occurrence of any of the foregoing events, Franchisee agrees that all claims, demands, or rights to payments for any services performed after the date that Franchisee's services to a customer are discontinued are waived.

With the exception of termination by a customer without cause during the Guarantee Period, as provided in Paragraph 10 B (4), Franchisee further agrees that Franchisee shall not be entitled to a no-charge replacement of any

Franchisee and its employees who attend any or all of Coverall's initial training programs shall divulge only such confidential information therein obtained as may be necessary, and then only to such of its full time and/or part time employees, agents, or independent contractors as must have access to it, in order to conduct the operation of the franchise business, and Franchisee shall take those precautions as shall be necessary to ensure that its employees retain such information in confidence.

If Franchisee is a proprietorship or partnership, Franchisee shall cause the proprietor or the partner, as the case may be, or other beneficial owner to execute Coverall's current Confidentiality/Non-Competition Agreement within ten (10) days of the execution of this Agreement or, in the case of an individual who assumes the status of proprietor, partner, or beneficial owner subsequent thereto, within ten (10) days after the assumption of such status, and submit all such executed Agreements to Coverall. If Franchisee is a corporation, Franchisee shall cause each officer, director, and shareholder thereof to execute Coverall's current Confidentiality/Non-Competition Agreement within ten (10) days of the execution of this Agreement or, in the case of an individual who assumes the status of officer, director, or shareholder subsequent thereto, within ten (10) days of the assumption of such status and submit all such executed Agreements to Coverall. Franchisee, whether a sole proprietorship, partnership, or corporation, will cause each of its employees upon ten (10) days of the execution of this Agreement, or upon ten (10) days of hire of any employee, whichever last occurs, to execute a Coverall Confidentiality/Non-Competition Agreement.

13.   FRANCHISEE IS AN INDEPENDENT CONTRACTOR. Franchisee is and shall remain at all times a completely independent contractor in business for itself, and shall have no right or interest in or authority over Coverall or any of Coverall's property or business. Neither Coverall nor Franchisee is the principal, agent, employer, employee, partner, officer, director, or owner of the other. Franchisee shall always hold itself out as an independent contractor in its dealings and communications with the public. Franchisee further agrees that it is not authorized to use the Marks or Substitute Marks in any capacity other than as provided herein, nor to sign on behalf of Coverall any checks, drafts, leases, bonds, mortgages, documents, bills, contracts, bills of sale or any other instruments in writing. Franchisee shall be free to conduct its business as it may deem best in providing services to the customer accounts, independently of the supervision, management, and control of Coverall, but Franchisee agrees to abide by all of the terms of this Agreement and all federal, state and local laws, OSHA requirements, and regulations of all government agencies having jurisdiction over the customer's premises or the activities conducted by Franchisee and all industry standards. Franchisee shall be responsible for all personal property, use, and other taxes assessed by governmental agencies. Franchisee shall be responsible for personal self-employment, income, and other taxes required to be withheld and hereby assumes full responsibility for payment of the employer's portion of any social security and other taxes required to be withheld for all of Franchisee's employees. Franchisee shall also pay and/or withhold taxes and premiums for unemployment and worker's compensation insurance for itself and all of its employees, as required by law. Franchisee shall provide Coverall, upon demand, proof of payment of all taxes due and compliance with all laws. Franchisee shall be responsible for all employment decisions and functions of its franchise business, including without limitation, those related to hiring, firing, training, wage and hour requirements, record keeping, supervision, and discipline of employees and order and sequence of work.

14.   INSURANCE. Franchisee shall be responsible for and shall indemnify and hold Coverall harmless for all losses, damages to property, or injuries to persons arising out of or connected with the performance or non-performance of Franchisee's business and services to customers, including any claimed damages for breach of security and claims or demands for damages resulting therefrom of whatever nature. Franchisee will obtain janitorial bonding in an amount not less than $100,000. Franchisee further agrees to maintain comprehensive liability insurance covering property damage, loss and personal injury in amounts not less than $1,000,000 per occurrence; $2,000,000 in the aggregate; and a $5,000,000 umbrella policy; as well as comprehensive automobile liability, including personal injury and property damage insurance, in the minimum amount of $50,000, or the amount required by state law, whichever is higher; all such policies naming Coverall as an additional insured. Franchisee also agrees that its comprehensive liability insurance will not contain an exclusion for property in Franchisee's care, custody, and control. In addition to the above, if any account serviced by Franchisee requires higher insurance coverage or a type of insurance not specified herein, Franchisee will, at Franchisee's expense, obtain such insurance. Failure to do so will result in loss of that account.

Initial   Initial

diligently pursuing the case or action at Franchisee's expense, or Coverall may hire counsel directly to protect its interests and bill Franchisee for all costs and attorneys' fees incurred in connection therewith, in which case Franchisee shall promptly reimburse Coverall[7] all costs and expenses which Coverall incurred. The obligations of Franchisee pursuant to this Paragraph shall survive the expiration or termination of this Agreement.

16.    ASSIGNMENT.

A.    Coverall's Right to Assign the Franchise Agreement. Coverall may, without the consent of the Franchisee, assign this Agreement, or Coverall's rights and duties under this Agreement, to any other entity or third party, whether affiliated with or independent of Coverall. Coverall may also assign to any other entity or third party, whether affiliated with or independent of Coverall, any promissory note or other negotiable instrument of Franchisee which is payable to Coverall. Said promissory note or other negotiable instrument may be assigned to another entity or third party in conjunction with or independent of this Agreement. Coverall's rights under this Agreement shall inure to the benefit of any such assignee or the legal successor to the interest of Coverall. Specifically, and without limitation to the foregoing, Franchisee expressly affirms and agrees that Coverall may sell its assets, its Marks, or its System outright to a third party; may engage in a private placement or public offering of some or all of its securities; may merge, acquire other corporations, or be acquired by another corporation; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and, with regard to any or all of the above sales, assignments, and dispositions, Franchisee expressly and specifically waives any claims, demands, or damages arising from or related to the loss of said Marks (or any variation thereof) and/or the loss of association with or identification with the Mark "Coverall" arising out of Coverall's exercise of the above reservation.

B.    Franchisee's Right to Assign the Franchise Agreement.

(1)    An assignment is defined as a voluntary or involuntary, direct or indirect, assignment, transfer, sale, gift, or other disposition by the Franchisee or any of its owners of any interest in this Agreement, the ownership of the Franchisee entity, or the franchise business, which assignment includes, without limitation: (i) assignment of ownership of stock or partnership interest; (ii) merger or consolidation or issuance of securities representing an ownership interest in the Franchisee entity; (iii) assignment in a divorce, insolvency, partnership, or corporate dissolution proceeding or otherwise by operation of law; and (iv) assignment in the event of death of the Franchisee or an owner of Franchisee, by will, declaration of or transfer in trust, or under the laws of intestate succession.

(2)    Franchisee may, with the written consent of Coverall obtained after thirty (30) days prior written notice to Coverall, which consent will not be unreasonably withheld, assign this Agreement to a person meeting the qualifications then established by Coverall for granting new franchises ("the assignee"), provided: (i) Franchisee provides Coverall a copy of any written agreements relating to the proposed assignment or transfer, and any additional information which Coverall may require in order to determine whether it will grant its consent to the proposed assignment or transfer; (ii) the assignee enters into the franchise agreement then used by Coverall for granting new franchises; (iii) Coverall shall assess Franchisee a transfer fee of $1,500; (iv) Franchisee pays to Coverall all amounts due by Franchisee to Coverall; (v) Franchisee executes confidentiality and non-competition agreements in assignee's favor and in Coverall's favor with terms and conditions the same as the non-competition covenant in Paragraphs 12 and 19 of this Agreement; (vi) the assignee shall have the ability to immediately be in compliance with all laws, regulations and ordinances governing commercial janitorial cleaning; and (vii) Franchisee executes a general release, in a form satisfactory to Coverall, of any and all claims against Coverall and its affiliates and their officers, directors, employees, and agents; and (viii) the shareholders or partners of any corporate or partnership assignee comply with the guaranty provisions of Paragraph 33 of this Agreement.

(3)    Coverall may, in Coverall's sole discretion, withhold said written consent of any proposed assignment in the event that Franchisee is in default under the terms of this or any other agreement with Coverall until said default is cured.

(4)    If, at the time of an assignment of this Agreement, there is Initial Business or Additional Dollar Volume to which Franchisee ("the assignor") is entitled, which Coverall has not yet provided to


Initial    Initial

D.    Franchisee's attempt to assign this Agreement or the franchise business, or any right or obligation hereunder, without first securing Coverall's written consent, upon thirty (30) days' written notice to Coverall.

E.    Franchisee's voluntarily abandoning the franchise business.

F.    Franchisee's having been charged with a work-related crime or any other crime that substantially impairs the goodwill associated with the Marks and System.

G.    Franchisee's failure on two or more occasions to comply with one or more of the provisions of this Agreement or any other agreement between Coverall and Franchisee.

H.    Franchisee's breach of Paragraph 19 of this Agreement.

I.    Franchisee's engaging in conduct that reflects materially and adversely upon the operation and reputation of Coverall's or Franchisee's businesses or the Marks or the System.

J.    Franchisee's monthly revenues are below $150 for two consecutive months or for each of any three months in a six-month period.

K.    A material misrepresentation in Franchisee's application to become a franchisee.

L.    At any time more than: (i) nine (9) months after the death or incapacity of Franchisee, or the appointment of a conservator or guardian for the person or estate of Franchisee, if Franchisee is an individual; or (ii) nine (9) months after the death or incapacity of any of the general partners, or the appointment of a conservator or guardian for the person or estate of any of the general partners, if Franchisee is a partnership; provided, however, that this Agreement shall not terminate if within said nine (9) months this Agreement or the general partner's interest herein is assigned in accordance with the provisions of Paragraph 16 of this Agreement.

If the termination results from default as defined in subparagraphs A, D, H, or L of this Paragraph 17, termination may occur upon the expiration of ten (10) days following written notice of said default, or as otherwise provided by law, if by then the Franchisee has failed to cure the default. If termination results from default as defined in subparagraphs B, C, E, F, G, I, J, or K, of this Paragraph 17, termination may occur immediately, without notice or opportunity to cure, unless otherwise provided by law.

18.    PROCEDURES AFTER TERMINATION.  Upon expiration, termination, or assignment of this Agreement for any reason, Franchisee shall cease to be a Coverall Franchisee and shall do all of the following acts

and things, each of which shall survive the termination of this Agreement and shall remain an ongoing obligation of Franchisee:

A.    Immediately pay to Coverall all monies due thereunder to the date of termination, and cease doing business in accordance with the provisions of Paragraph 19 of this Agreement. Any amounts due Coverall at or after Franchisee's termination may be offset against any amounts collected by Coverall on Franchisee's behalf.

B.    Immediately and permanently discontinue the use of all Coverall Marks, or any other name or designation indicating or tending to indicate that Franchisee is or ever was an authorized Coverall franchise. Furthermore, Franchisee shall not promote or advertise the fact that Franchisee was formerly a franchisee or affiliate of the Coverall organization.

C.    Promptly surrender to Coverall all stationery, letterheads, forms, manuals, printed matter, films, books, cassettes, videotapes, and advertising containing Coverall Marks, including, but not limited to, the proprietary mark "Coverall," or any similar names or marks or designation indicating or tending to indicate that


Initial  Initial



and maintenance services, in any county located partially or entirely within, or contiguous to, the Metropolitan Statistical Areas in which Franchisee's Coverall Regional office conducts business, or within a 100-mile radius of that Coverall Regional office, whichever distance is greater. Franchisee will not, during the time period and in the geographic area covered by this Paragraph 19B, influence or attempt to influence previously existing cleaning customers, whether of Franchisee or of other Coverall franchisees, to divert or attempt to divert from Coverall or its franchisees any cleaning accounts which were being serviced by the Coverall system during the year preceding the date on which Franchisee left the Coverall system.

      C.    <u>Persons Bound By Covenants Not To Compete</u>. Any person or entity having any legal or beneficial relationship to or interest in or traceable to, down, or through Franchisee is bound by the provisions of these covenants. Such persons shall include, but shall not be limited to, Franchisee's family members.

      D.    <u>Court Modification of Agreement</u>. The Franchisee agrees that this form of Agreement is prepared for use in many jurisdictions with differing public policies and that such public policies change. Accordingly, the Franchisee agrees that the prevailing non-competition restrictions set forth above may be modified by a Court to the extent necessary to make the non-competition agreements valid and enforceable against Franchisee.

### 20.    INFORMAL DISPUTE RESOLUTION.

      A.    <u>Mediation.</u> Except as is otherwise provided in Paragraph 20B, if a dispute arises out of or relates to this Agreement, or to the relationship of the parties, and if the dispute cannot be resolved or settled through negotiation, the parties agree that prior to the filing of any arbitration or other legal action consistent with the provisions of this Agreement, they will attempt, in good faith, to settle the dispute by non-binding mediation administered pursuant to the Commercial Mediation Rules of the American Arbitration Association, or as otherwise agreed upon by the parties. The mediation shall take place in the Area in which Franchisee conducts its business (as defined in Paragraph 3), and shall be administered by a neutral mediator agreed upon by the parties. In the event the parties are unable to agree upon a mediator within 15 days of the date on which either party requests mediation of a matter, the mediator shall be provided by the American Arbitration Association. The costs of the mediation shall be shared equally by the parties.

      B.    Notwithstanding anything to the contrary in Paragraph 20A, if Franchisee's Coverall Franchise Agreement has expired or been terminated, or if Franchisee has abandoned or failed to operate the Franchise for more than 30 days, Coverall shall not be required to avail itself of non-binding mediation in matters dealing with (i) the collection, by Coverall, of royalties or management fees claimed to be owing to Coverall by Franchisee; or (ii) the collection, by Coverall, of amounts claimed to be owing to Coverall by Franchisee under any promissory notes, equipment purchases, or lines of credit.

### 21.    ADDITIONAL REMEDIES FOR BREACH.

      A.    <u>Arbitration</u>. Except as otherwise provided in Paragraphs 21A(14) and 21B, all controversies, disputes or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arising out of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Coverall Policy and Procedure Manual, which controversies, disputes or claims are not resolved in accordance with Paragraph 20, shall be submitted promptly for arbitration.

        (1)    Arbitration shall be subject to the Federal Arbitration Act and, except as otherwise provided in this Agreement or agreed upon by the parties, the then current Rules of the American Arbitration Association for Commercial Arbitration.

        (2) The arbitration shall take place in the Area in which the Franchisee conducts its business, and shall be administered by the office of the American Arbitration Association or as mutually agreed by the parties.





Initial   Initial



**B. Injunction and Specific Performance.** Notwithstanding anything in Paragraphs 20 and 21 to the contrary, Coverall shall be entitled to apply directly to a court of competent jurisdiction for the entry of preliminary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement or any other related agreement pertaining to Franchisee's use of the Marks; the obligations of Franchisee regarding confidentially or non-competition; any assignments or attempted assignments of this Agreement by Franchisee; any matter relating to the ownership of the Franchise, and/or any other matter for which Coverall would have no adequate remedy at law. If Coverall secures any such injunction or order of specific performance, Franchisee agrees to pay Coverall an amount equal to the costs incurred by Coverall in obtaining such relief, including, without limitation, attorney's fees, litigation costs and expenses, as well as any damages incurred by Coverall as a result of Franchisee's actions.

**C. Attorneys' Fees.** Should either Party incur attorney's fees in order to enforce the terms and conditions of this Agreement, including post-term covenants, whether or not an arbitration proceeding is instituted, the prevailing party shall be entitled to reimbursement by the other party of all litigation costs, including attorneys' fees.

**D. Survival.** The parties agree that the provisions of this Paragraph 21 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

**22. TIME TO ASSERT CLAIMS.** Any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisee and Coverall[7], or Franchisee's operation of its business, brought by any Party hereto against the other, shall be commenced within two years from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred.

**23. GOVERNING LAW.** This Agreement shall be interpreted and governed by the laws of the state in which the Franchise granted herein is located.

**24. ENTIRE AGREEMENT.** This is the full agreement of the parties. Any matter which is not actually written down and included in this document is not a term of this Agreement. To avoid any later misunderstanding about the exact terms of the Agreement, each Party affirms, by affixing its signature to this Agreement, that it has not relied on any comment, promise, or representation not actually included within the Agreement itself. By signing this Agreement, the parties mutually agree that no evidence shall be admitted in any proceeding as to the existence of any term or promise claimed to be a part of the Agreement unless that term is explicitly stated within the Agreement. *DO NOT SIGN THIS AGREEMENT IF YOU ARE RELYING UPON ANY REPRESENTATION OR PROMISE NOT INCORPORATED INTO THIS AGREEMENT.*

**25. AMENDMENT.** This Agreement may not be modified, altered, or amended except in writing executed by all of the Parties hereto.

**26. WAIVERS.** Waiver by Coverall of any one or more defaults shall not operate as a waiver of successive or other defaults and all of Coverall's rights shall continue notwithstanding any such waiver or waivers.

**27. FORCE MAJEURE.** No party hereto shall be liable for any loss or damage due to any delay in the due performance of the terms hereof (except for the payment of money) by reason of strikes, lockouts, and other labor troubles, fires, riots, wars, embargoes and civil commotion, or acts of God. Any such delay shall extend performance only so long as such event is in progress.

**28. SEVERABILITY.** If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions herein shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

**29. NOTICES.** Any notices to be given hereunder by either Party to the other may be effected in writing either by personal delivery or by first class mail, postage prepaid. Mailed notices should be addressed to Franchisee and to Coverall at the addresses set forth on Page 1 of this Agreement. Either Party may designate a different address for notice in writing delivered to the other Party. Notices personally delivered shall be deemed received when

© 2002 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page - 23 -



Initial Initial

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on the day and year written above (see Page 1 of this Agreement).

(If Franchisee is a partnership, this Agreement must be signed by each partner. If Franchisee is a corporation, this Agreement must be signed by a duly authorized officer.)

THIS AGREEMENT SHALL NOT BE VALID UNLESS SIGNED BY (i) FRANCHISEE; (ii) AN AUTHORIZED REPRESENTATIVE OF COVERALL'S REGIONAL OFFICE; AND (iii) A CORPORATE OFFICER AT COVERALL'S CORPORATE OFFICE.

FRANCHISEE: _Ocymr senect do synes_

(Print name of sole proprietor, partnership, or corporation.)

By: _Oesar smith_

Date Signed

By: _____

_08/27/02_

Date Signed

By: _____

Date Signed

COVERALL NORTH AMERICA, INC.

By: _Jam J H au_

_8/27/02_

Date Signed

Title: _Regional Director_

Coverall of Boston

ACCEPTED ON THIS _18th_ DAY OF _September_, _2002_.
(EFFECTIVE DATE OF AGREEMENT)

COVERALL NORTH AMERICA, INC.

By: _Jacqueline W. Vleming_, Vice President

RECYCLED

# OVERALL NORTH AMERICA, INC.
## CONSENT TO TRANSFER

RECEIVED

JAN 2 0 2004

BY:

THIS AGREEMENT is entered into this <u>29th</u> day of <u>December, 2003,</u> Coverall North America, Inc., d/b/a Coverall of <u>Boston,</u> ("Coverall"), <u>Cesar S</u> ("Franchisee") Franchise # <u>F694</u>, and <u>Adelson Sodre</u> ("Transferee") Transfer Franchise #:<u>T818</u>.

## Recitals

Franchisee executed a Janitorial Franchise Agreement and related documents (the "Franchise Agreement") on <u>August 27, 2002,</u> under which the Franchisee was to operate a Coverall janitorial franchise (the "Franchise").

Franchisee desires to sell his Franchise to Transferee, and Transferee desires to purchase Franchisee's Franchise.

Coverall consents to Franchisee's sale of the Franchise to Transferee upon the terms and conditions of this Consent to Transfer (the "Consent").

## Terms and Conditions

IN CONSIDERATION OF the foregoing Recitals, which shall be deemed a part of this Agreement, the mutual covenants and agreements contained in this Consent, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, Coverall, Franchisee and Transferee agree as follows:

1. As a condition precedent to Coverall's consent to Transferee's purchase of Franchisee's Franchise, Transferee agrees to and shall execute, simultaneous with the execution of this Consent:

   A.    The Guaranty to Coverall Janitorial Franchise Agreement; and

   B.    Confidentiality/Non-Competition Agreement.

2. Franchisee shall cause to be paid to Coverall, Coverall's current Transfer Fee.

3. Franchisee releases and forever discharges Coverall and its successors and assigns of and from all manner of actions, cause or causes of action, suits or debts, and sums of money, dues, claims, and demands whatsoever, in law or equity, which Franchisee has ever had or now has by reason of the Franchise Agreement, the Franchise relationship, the granting of the Franchise, or any alleged violations of the United States Federal Trade Commission's Trade Regulation Rule 436 relating to disclosure requirements, and State franchise disclosure and franchise relationship laws, deceptive or unfair trade practices laws, or securities laws and/or other laws, statutes, rules or regulations of the United States or of any state or other government subdivision or agency. Nothing contained in this ¶3 shall be construed as releasing Coverall from any obligation it might have under the Franchise Agreement to remit to the Franchisee monies presently due or which

may come due the Franchisee for services rendered by Franchisee to any cleaning account in the operation of the Franchise.

4. Survival of Specific Provisions of the Franchise Agreement: Franchisee acknowledges that the following provisions of the Franchise Agreement shall survive his assignment to Transferee and that he [she] shall remain obligated to abide by the terms and conditions of these surviving provisions:

A. Paragraph 1, "Use of Trade Name, Service Marks, and Confidential and Proprietary Information;"

B. Paragraph 18, "Procedures After Termination"; and

C. Paragraphs 19(B) and (C), "Non-Competition."

5. Indemnity. Franchisee and Transferee agree to indemnify and hold harmless Coverall from any claims that may arise on account of Coverall's consent to this Transfer, including but not limited to, claims by Transferee to the proceeds of any distribution made by Coverall to Franchisee subsequent to the execution of this Consent. Indemnity shall include but not be limited to damage awards, amounts paid in settlement of any claim, attorneys' fees and costs.

6. Transferee shall, if requested by Coverall, attend training at the Regional Office.

7. Transferee acknowledges that on the date of execution of this Consent, that:

A. Franchisee is servicing RS of $479.00 per month; and

B. Franchisee has Business Owed of $0.

8. As part of the purchase price paid to Franchisee, Transferee has agreed to assume certain obligations owed by the Franchisee to Coverall. Transferee has agreed and Coverall has consented to the assumption of Franchisee's Note(s) No(s). 12783, which Note(s) has [have] a balance due to Coverall in the amount of $2384.21, plus interest. These Notes represent either the balance due to Coverall for Franchisee's initial franchise fee or for additional business purchased by Franchisee.

9. Transferee acknowledges that upon execution of the Guaranty as required by ¶1(A) of this Consent that Transferee shall become personally liable to Coverall for the amount stated in ¶6 of this Consent.

## SIGNATURES APPEAR ON THE FOLLOWING PAGE

Revised 2003

IN WITNESS HEREOF, Coverall, Franchisee and Transferee have executed this Agreement on the day and year first above written.

**COVERALL NORTH AMERICA, INC.**

By _____

Its Authorized Representative

**FRANCHISEE:**

_____

**TRANSFEREE:**

_____

RECYCLED

# GUARANTY TO COVERALL JANITORIAL FRANCHISE AGREEMENT    FO# 7818

In consideration of, and as an inducement to Coverall North America, Inc. dba Coverall of BOSTON ("Coverall"), entering into a Janitorial Franchise Agreement ("the Agreement") dated Dec 29, 03, with Adelson Sodre ("Franchisee"), the undersigned ("the Guarantor(s)") does hereby unconditionally guaranty, personally, the obligations of the Franchisee under the Agreement, as follows:

1. Guarantor(s) jointly, severally and unconditionally guaranties to Coverall performance of all responsibilities, duties, indebtedness and obligations of the Franchisee under the Agreement, including, but not limited to, (a) payment of any fees due under the Agreement, including, but not limited to, initial fee, royalties, management fees, assignment fees, interest or late fees, training fees (if any) and fees for products, supplies or services furnished by Coverall to Franchisee; (b) obligations to hold harmless, defend and indemnify Coverall and related parties; and (c) any and all advances, debts, obligations, notes and liabilities of the Franchisee incurred in connection with or as a result of the Agreement, previously, now, or hereafter made, incurred, or created, voluntary or involuntary and, however arising.

2. Guarantor(s) authorizes Coverall, (whether or not after revocation or termination of this Guaranty) without notice or demand (except as may be required by law) and without affecting or impairing Guarantor(s)' liability hereunder, from time to time, to (a) renew, compromise, extend, accelerate, or otherwise change the time for performance of, or otherwise change the terms of the obligation or any part thereof; and (b) release or substitute any one or more of the Guarantors, if there is more than one.

3. Any indebtedness of the Franchisee now or hereafter held by Guarantor(s) is hereby subordinated to the indebtedness of the Franchisee to Coverall, and all such indebtedness shall, if Coverall so requests, be collected, enforced, and received by Guarantor(s) as trustee(s) for Coverall, and be paid over to Coverall on account of the indebtedness of Franchisee to Coverall, without affecting or impairing in any manner the liability of Guarantor(s) under the other provisions of this Guaranty.

4. Guarantor(s) waives any right to require Coverall to (a) proceed against the Franchisee; (b) proceed against or exhaust any security held from the Franchisee; or (c) pursue any other remedy in Coverall's power whatsoever. Guarantor(s) waives any defense based on or arising out of any defense of the Franchisee other than payment in full of the indebtedness, including, but not limited to, any defense based on or arising out of the disability of the Franchisee, the unenforceability of the indebtedness or any part thereof from any cause, or the cessation from any cause of the liability of the Franchisee, other than payment in full of the indebtedness. Coverall may, at its election, foreclose on any security held by Coverall by one or more judicial sales, whether or not every aspect of any such sale is commercially reasonable, or exercise any other right or remedy Coverall may have against the Franchisee or any security, without affecting or impairing in any way the liability of Guarantor(s) under this Agreement, except to the extent the indebtedness has been paid. Guarantor(s) waives any defense arising out of such an election by Coverall, even if the election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Guarantor(s) against the Franchisee or any security. Until all indebtedness of the Franchisee to Coverall is paid in full, even though that indebtedness is in excess of Guarantor's liability under this Agreement, Guarantor(s) shall (a) have no right of subrogation; (b) waive any right to enforce any remedy that Coverall now has or may hereafter have against Franchisee; and (c) waive any benefit of, and any right to, participation in any security now or hereafter held by the Franchisee. Guarantor(s) waives all presentments, demands for performance, notices of protest, notices of dishonor, notices of acceptances of this Guaranty, and notices of the existence, creation, or incurring of new or additional indebtedness. Guarantor(s) assumes all responsibility for keeping informed of the Franchisee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the indebtedness and the nature, scope, and extent of the risks that Guarantor(s) assumes and incurs hereunder, and agrees that Coverall shall have no duty to advise Guarantor(s) of information known to it regarding those circumstances or risks.

5. Guarantor(s)' obligations hereunder are joint and several, and independent of those of the Franchisee, and a separate action or actions may be brought and prosecuted against the Guarantor(s) whether action is brought against the Franchisee and/or Guarantor(s), or whether the Franchisee and/or the Guarantor(s) be joined in any such action or actions; and the Guarantor(s) waives the benefit of any statute of limitations affecting the Guarantor(s)' liability hereunder, or the enforcement thereof.

6. In addition to the amounts guaranteed under this Agreement, Guarantor(s) jointly and severally agrees to pay reasonable attorneys' fees and all other costs and expenses incurred by Coverall in enforcing this Guaranty in any action or proceeding, arising out of, or relating to, this Guaranty.

7. It is not necessary for Coverall to inquire into the powers of the Franchisee or the officers, directors, or agents acting or purporting to act on their behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

8. If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties of this Agreement shall be construed and enforced accordingly.

9. In addition to the above provisions, Guarantor(s) agrees to comply with all provisions and covenants in the Agreement related to the protection of the Coverall trade and service marks and the Coverall confidentiality and trade secrets (both in-term and post term). In addition the Guarantor(s) agrees to be bound by all Non-Competition covenants of the Agreement, both in-term and post-term, which covenants shall be as fully binding and enforceable on Guarantor(s) as though they were set forth herein.

IN WITNESS WHEREOF, the undersigned Guarantor(s) has this 29 day of Dec, 03 executed this Guaranty in the City of Stoneham, State of MA.

**"GUARANTOR(S)"**

| Signature | Print Name | Address |
|---|---|---|
| _Adelson Sodre_ | | 12 GROVER St #6 02148 |
| _Adelson Sodre_ | | 12 GROVER St #6 02148 |
| _Adelson Sodre_ | | 12 GROVER St #6 02148 MALDEN MA |

© 2003 Coverall North America, Inc.

Exhibit A.2 to
Janitorial Franchise Offering Circular

## PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.

Attorneys at Law
· 18 Tremont Street, Suite 500
Boston, MA 02108

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles
Katherine D. Shea

M. Amy Carlin
Nicole Horberg Decter**
Rebecca G. Pontikes
Alfred Gordon
Leah M. Barrault

*Also admitted in Maine
**Also admitted in New York

Telephone (617) 367-7200
Fax (617) 367-4820

Tod A. Cochran
OF COUNSEL

September 14, 2005

**VIA MAIL AND FACSIMILE** (401) 435-6529
Wilma Rooney
Michaela E. Gaudette
Case Managers
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914

Re:    Coverall North America, Inc.

Dear Ms. Rooney and Ms. Gaudette;    ·

Coverall North America, Inc. ("Coverall") has filed eight arbitration demands against individuals whom I represent; their names and the AAA case numbers are listed below. I am writing to notify you that I represent these individuals and that you should communicate with me, rather than directly with them, in connection with these cases.

These individuals dispute that there is a valid arbitration agreement between them and Coverall. A class action lawsuit against Coverall will be filed in court imminently, asserting that these workers should have been classified as employees of Coverall, rather than as independent contractors, along with other related claims.

I request that these arbitration cases be stayed pending a judicial determination regarding whether these claims may be heard in court or instead whether they must be arbitrated.

In the event that the AAA does not immediately stay these arbitration cases, and proceeds with the administrative conference calls for these cases that are scheduled to begin tomorrow, September 15, 2005, I request that one call be



**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

held, rather than eight separate calls. Michael Vhay represents Coverall in each of these matters, and I represent each of the respondents; accordingly, it would be much more efficient to hold one conference call rather than eight separate calls.

Please let me know if you have any questions, and whether these cases may be stayed and the administrative conference calls accordingly postponed.

Sincerely,

Shannon Liss-Riordan

cc:    Michael Vhay, Esq.

Cases:

Coverall North America, Inc. and Joao Padihla
Case No. 11-114-01899-05

Coverall North America, Inc. and Wanor de Carvalho
Case No. 11-114-E-01903-05

Coverall North America, Inc. and Sandra Lisboa and Miriam Carvalho
Case No. 11-114-01902-05

Coverall North America, Inc. and Amilton DeSouza and Carlos Furtado
Case No. 11-114-01907-05

Coverall North America, Inc. and Adelson Sodre
Case No. 11-114-E-01904-05

Coverall North America, Inc. and Luciana Canestrano
Case No. 11-114-01901-05

Coverall North America, Inc. and Napoleo Pereira
Case No. 11-114-E-01906-05

Coverall North America, Inc. and Marcos Martins
Case No. 11-114-01898-05

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)_____ Coverall North America, Inc. v. Adelson Sodre

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

| | | |
|---|---|---|
| ☐ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. |
| ☑ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. *Also complete AO 120 or AO 121 for patent, trademark or copyright cases |
| ☐ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. |
| ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
| ☐ | V. | 150, 152, 153. |

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES ☐    NO ☑

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐    NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES ☑    NO ☐

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☑    Central Division ☐    Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES ☐    NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME ___ Michael D. Vhay and Traci S. Feit, DLA Piper Rudnick Gray Cary US LLP

ADDRESS ___ One International Place, 21st Floor, 100 Oliver Street, Boston, MA 02110-2600

TELEPHONE NO. ___ 617-406-6000

(CategoryForm.wpd  - 5/2/05)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Coverall North America, Inc.

## DEFENDANTS
Adelson Sodre

**(b)** County of Residence of First Listed Plaintiff **Boca Raton, Florida**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Michael D. Vhay and Traci S. Feit, DLA Piper Rudnick Gray Cary US LLP, One International Place, 21st Floor, Boston, MA 02110

Attorneys (If Known)

Shannon Liss-Riordan, Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., 18 Tremont Street, Suite 500, Boston, MA 02108

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☒ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
9 U.S.C. s. 4
Brief description of cause:
Petition to compel arbitration

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE
DOCKET NUMBER

DATE 09/15/2005
SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY
RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE